COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 
2-02-323-CR
 
JEFFREY LEE WEST                                                               APPELLANT 
 
V.
 
THE STATE OF TEXAS                                                                  STATE 
 
------------
 
FROM THE 
213TH DISTRICT COURT OF TARRANT COUNTY 
 
------------
 
OPINION
 
------------
I. Introduction
        A jury convicted Appellant Jeffrey Lee West (“West”) of four counts of
aggravated sexual assault of a child under fourteen years of age. The jury
assessed West’s punishment at ten years’ community supervision on each of
the first three counts and five years’ confinement on count four of the
indictment.
        West raises seventeen issues on appeal. In issues one through ten, West
alleges that the trial court’s refusal to permit him to cross-examine and impeach
the victim, D.M., with certain entries and an omission from her diary violates 
his Sixth Amendment right of confrontation. In issues eleven and twelve, West
contends that the trial court erred in admitting D.M.’s mother’s testimony. 
Issue thirteen addresses the trial court’s refusal to grant West’s motion for
mistrial. Issues fourteen and fifteen challenge the constitutionality of the Allen
charge the trial court gave to the jury. Issues sixteen and seventeen challenge
the legal and factual sufficiency of the evidence. We will affirm.
II. Background Facts
        West and D.M.’s mother, Ruth Dodson, married when D.M. was
approximately three years old. West was D.M.’s stepfather, as well as the
father of two other daughters he had with Dodson. In January 1999, Dodson’s
father died, requiring her to travel out of the state for some period of time. 
During this time, West took care of his stepdaughter, as well as the couple’s
other two daughters.
        Trial testimony showed that one evening, before Dodson returned to
Texas, D.M. was ironing her school clothes in her mother and stepfather’s
bedroom. West approached her and instructed her to take off her panties and
iron them, stating that this would “feel good.” West then instructed the eleven-year-old to take off all her clothes so he could “teach [her] about sex.” D.M.
obeyed her stepfather.
        West then instructed D.M. to get a mirror and come sit on the bed, and
he proceeded to point out the features of the child’s genitalia. West also used
his fingers to guide his lesson on sex education. Once he was through
“instructing” the child with the mirror, he proceeded to remove his clothes and
had D.M. hold his sexual organ in her hand and then directed her to lie down on
the bed. D.M. testified that West then put his mouth both on and inside her
genitals. Finally, West somewhat penetrated her genitals with his sexual organ
until she told him to stop because he was hurting her. Upon ending physical
contact, West stated that he hoped D.M. had “learned something” so that she
would not “need to go out and find out what it’s like.” He also told D.M. not
to tell anyone what had happened.
        In January 2000, D.M. and her mother were kicked out of the Wests’
home, and a bitter divorce and custody battle over the two younger daughters
ensued. During the following summer, while spending summer visitation with
her natural father, D.M. disclosed that West had inappropriately touched her.
Thereafter, upon returning home to her mother’s residence in Galveston, Texas,
D.M. disclosed partial details of the encounter to her mother.
        Dodson contacted the toll-free, hotline number for Texas Child Protective
Services. The agency commenced an investigation into the safety of D.M.’s
two younger sisters living in Arlington, as well as an investigation into D.M.’s
accusations. D.M. was subsequently interviewed and videotaped at the child
advocacy center in Galveston. As a result of this investigation, West was
indicted and then convicted of four counts of aggravated sexual assault of a
child under fourteen years of age.
III. The Diary
        In his first nine issues, West complains that the trial court erred at the
guilt-innocence phase of trial by refusing to permit him to cross-examine and
impeach D.M. (1) with two entries from D.M.’s diary and (2) concerning the lack
of a diary entry regarding the assault. Specifically, the two entries that West
asserted were admissible were: (1) a September 7, 1999 entry in which D.M.
wrote that she had said a few untrue things about her stepfather and that she
was mad when she wrote those things (issues one, four, and seven); and (2) a
February 6, 1999 entry that discussed a “peck on the cheek” incident between
D.M. and a classmate at a dance (issues three, six, and nine). Finally, the
omission West sought to question D.M. about was her failure to write in her
dairy about the sexual assault despite an entry indicating that she intended to
write “everything” in her diary (issues two, five, and eight).


 A.Standard of Review
        The trial court’s decision to admit or exclude evidence is afforded a great
deal of discretion. Montgomery v. State, 810 S.W.2d 372, 378-79 (Tex. Crim.
App. 1990). Therefore, we review a trial court’s ruling on admissibility or
exclusion of evidence under an abuse of discretion standard. Angleton v. State,
971 S.W.2d 65, 67 (Tex. Crim. App. 1998). If the trial court’s evidentiary
ruling is reasonably supported by the record and is correct under any theory of
applicable law, we must uphold it—this is known as the “zone of reasonable
disagreement” test. Montgomery, 810 S.W.2d at 391. “The mere fact that a
trial judge may decide a matter within his discretionary authority in a different
manner than an appellate judge in a similar circumstance does not demonstrate
that an abuse of discretion has occurred.” Id. at 380. We apply an abuse of
discretion standard of review to West’s first through ninth issues.B.The September 7, 1999 Diary Entry
        West’s first and seventh issues concern the following entry in D.M.’s
diary: “I know I’ve said a few things about daddy but almost all of them were
not true. I was mad when I wrote them. I love daddy and I’ll miss him. He has
showed and taught me a lot.” The record shows that D.M. referred to her
stepfather as “daddy.” West contends that the trial court abused its discretion
by refusing to permit him to cross-examine D.M. with this diary entry because
it was offered for impeachment purposes, not to prove the truth of the matter
asserted, and, alternatively, because it falls within one of the hearsay
exceptions. See Tex. R. Evid. 803(24).
        We hold that the trial court did not abuse its discretion by refusing to
permit West to cross-examine D.M. with this diary entry. D.M.’s diary was
offered into evidence by West in a bill of exceptions. Throughout the diary,
D.M. writes as though the diary were an actual person, giving the diary a name
and writing things like, “Also I probably didn’t tell you,” “I would tell you more,
but,” and “So I guess I will go, talk to you later.” Thus, the trial court could
have reasonably interpreted D.M.’s statement that “I know I’ve said a few
things about daddy” that were not true, but “I was mad when I wrote them” as
meaning that D.M. said bad things to her diary about West, but that these things
were not true and she was mad when she wrote them. [Emphasis added.] 
Indeed, based on our review of the diary, we agree with the trial court that this
was the probable meaning of D.M.’s statement. Furthermore, the dairy contains
no reference to the sexual assault at issue in this case. Whatever untrue things
D.M. purportedly wrote in her diary, they did not involve the present sexual
assault. Thus, they do not appear relevant except as an effort to show a
general untruthful character, and for the reasons explained below, this specific
incident of alleged untruthfulness is not admissible for that purpose. See Tex.
R. Evid. 401, 608. Consequently, we cannot say that the trial court acted
outside the zone of reasonable disagreement by refusing to permit West to
cross-examine D.M. with this entry. See Holt v. State, 912 S.W.2d 294, 301
(Tex. App.—San Antonio 1995, pet. ref’d) (holding trial court did not err in
refusing to permit defendant to cross-examine and impeach child sexual assault
victim with diary entries); see also Ayers v. State, 606 S.W.2d 936, 941 (Tex.
Crim. App. 1980) (op. on reh’g) (holding murder victim’s personal diary found
after trial did not warrant a new trial based on newly discovered evidence). We
overrule West’s first issue.
        In his seventh issue, West claims that he should have been permitted to
impeach D.M. with this entry after she testified that she had not become so
angered at West that she said untrue things about West to others. Great
latitude should be allowed in cross-examining witnesses to reveal possible bias,
prejudice, or self-interested motives to falsify testimony. It is likewise true that
the burden of showing the relevance of particular evidence to the issue of bias
rests on its proponent. Chambers v. State, 866 S.W.2d 9, 26-27 (Tex. Crim.
App. 1993), cert. denied, 511 U.S. 1100 (1994); Janecka v. State, 739 S.W.2d
813, 830 (Tex. Crim. App. 1987). Moreover, the parameters of
cross-examination for the showing of bias rests on the sound discretion of the
trial judge. Chambers, 866 S.W.2d at 27. The trial judge must balance
probative value against prejudicial risks, i.e., undue prejudice, embarrassment,
harassment, confusion of the issues, and undue delay. Id.
        Writing untrue things in a diary is not the same as saying untrue things to
a live person. D.M.’s diary entry that she said untrue things to her diary about
West (but not regarding the sexual assault at issue) and that she was mad when
she wrote those things does not establish D.M. lacked credibility or had bad
character. D.M. was never asked whether she wrote anything untrue about
West. Her diary entry that she said untrue things to her diary does not impeach
her testimony that she had never said untrue things about West to a live person,
nor does this entry show any bias by D.M. Instead, the entry shows that D.M.
loves West and states that she will miss him after the divorce. Again, we
cannot say that the trial court acted outside the zone of reasonable
disagreement by refusing to admit D.M.’s diary entry or by refusing to permit
West to use the entry to impeach D.M. See id.
        Finally, as pointed out by the State, this diary entry was not admissible to
show that D.M.’s character for truth-telling was poor. Rule 608 of the Texas
Rules of Evidence permits a party to prove a witness’s character for truthfulness
or untruthfulness via opinion or reputation testimony. Tex. R. Evid. 608.
Because this diary entry involved a specific instance of conduct, i.e., writing
false things in a diary, it was not admissible to impeach D.M.’s credibility or
truthfulness. For this reason, the trial court also did not act outside the zone of
reasonable disagreement by refusing to admit D.M.’s diary entry or by refusing
to permit West to use the entry to impeach D.M. We overrule West’s seventh
issue.C.     The February 6, 1999 Diary Entry
        In his third and ninth issues, West claims that the trial court abused its
discretion by refusing to permit him to cross-examine and impeach D.M. with a
February 6, 1999 diary entry which reads, in part: “Also I probably didn’t tell
you but Nick and I kissed each other on the cheak [sic] at the last dance.” West
argues that this “intimate contact” indicated “sexual behavior” that was
inconsistent with the behavior of a child who had been sexually abused. The
trial court excluded this diary entry under rule 412 and as irrelevant. See Tex.
R. Evid. 401, 412. 
        The Texas Rules of Evidence define relevancy as "evidence having any
tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be
without the evidence.” Tex. R. Evid. 401. The burden of showing the relevance
of particular evidence to the issue of bias rests on its proponent. Chambers,
866 S.W.2d at 26-27; Holt, 912 S.W.2d at 301. A trial court’s decision as to
the relevancy of evidence depends wholly upon “one judge’s perception of
common experience.” Montgomery, 810 S.W.2d at 391 (citing Weinstein &
Berger, Weinstein’s Evidence, 401-53 (1990)). Thus, questions of relevance
should be left largely to the trial court and will not be reversed absent an abuse
of discretion. Moreno v. State, 858 S.W.2d 453, 463 (Tex. Crim. App.), cert.
denied, 510 U.S. 966 (1993).
        West claims D.M.’s kiss on the cheek with Nick was relevant because this 
“intimate contact” is behavior inconsistent with that of a child recently
molested. This argument alleged as fact, i.e., that sexually abused girls do not
have intimate contact with boys in their peer group, was never proven. In fact,
West’s expert testified that “sexually promiscuous” behavior is a good indication
that a child has been sexually abused, which seems to run counter to West’s
position. In light of the lack of evidence showing that a young girl who had
been recently sexually assaulted would be unlikely to kiss a boy on the cheek
at a dance, the disputed evidence lacks any probative value. See Boyle v. State,
820 S.W.2d 122, 149 (Tex. Crim. App. 1991) (op. on reh’g) (holding trial court
properly excluded diary entry documenting victim’s past sexual behavior because
it lacked probative value), cert. denied, 503 U.S. 921 (1992). The trial court
acted within the zone of reasonable disagreement by concluding that this diary
entry was not relevant and by excluding it on that basis. We overrule West’s
third and ninth issues.
        D.     The Diary Omission
        In his second and eighth issues, West complains that the trial court erred
by refusing to allow him to impeach D.M. with the fact that she failed to make
a diary entry regarding the assault despite writing in her diary that she intended
to write “everything” in it. Thus, West argues that D.M.’s failure to record her
stepfather’s assault impacts her credibility.
        We hold that the trial court did not abuse its discretion by refusing to
permit West to impeach D.M. by questioning her about her failure to record the
sexual assault in her diary despite writing that she would include “everything”
in it. D.M. was not under oath when she wrote that she intended to record
everything in her diary. She had no moral, ethical, or legal obligation to write
anything in the diary at all. The fact that an eleven-year-old girl at some point
intended to write in her diary more frequently and wrote, “You are sort of my
Jewl because I keep you and treasure you because I write everything in you and
tell you all my feelings and stuff” simply does not impact the credibility of her
testimony concerning nondiary-entry events. [Emphasis added.] We overrule
West’s second and eighth issues.
        E.     Did the State Open the Diary Door?
        On redirect examination by the State, D.M. testified that she had not
recorded anything about the assault in her diary. West argues in issues four,
five, and six, that via this question—whether D.M. ever wrote anything in her
diary regarding what West did to her—the State opened the door for him to
cross-examine and impeach D.M. with the September 7, 1999 and the February
6, 1999 diary entries as well as with the diary omission. 
        “Rule 107 is one of admissibility and permits the introduction of otherwise
inadmissible evidence when that evidence is necessary to fully and fairly explain
a matter ‘opened up’ by the adverse party.” Johnson v. State, 747 S.W.2d
451, 453-54 (Tex. App.—Houston [14th Dist.] 1988, pet. ref’d). “The so-called
rule of optional completeness takes effect when other evidence has already been
introduced but is incomplete and misleading.” Jones v. State, 963 S.W.2d 177,
182 (Tex. App.—Fort Worth 1998, pet. ref’d). Once an evidentiary door has
been opened by one side, this rule serves to allow the other side to complete the
picture. The party who opens the door may not then invoke the rule of optional
completeness to further exploit an improper line of questioning. See Hatley v.
State, 533 S.W.2d 27, 29 (Tex. Crim. App. 1976); Jones, 963 S.W.2d at 182.
        When D.M. and her mother moved out of the Wests’ home, D.M. left
behind her diary. West’s counsel brought the diary to trial and first broached the
topic of D.M.’s diary. D.M. testified that she had forgotten all about the diary.
West’s counsel made numerous attempts to question D.M. about certain diary
entries and her failure to make certain entries. As a result of West’s counsel’s
cross-examination of D.M., it is highly probable that the jury was left with the
impression that there was something in the diary relevant to the charged sexual
assault incident. Therefore, on redirect examination of D.M., the State invoked
the rule of optional completeness and clarified that the diary contained nothing
relevant to the assault at issue by asking D.M. whether she recognized the diary
and whether she ever wrote anything in the diary about the abuse. D.M.
answered that the diary was hers and that she did not write anything in it about
the abuse, giving the exact testimony West’s counsel had attempted to elicit
from her. Under these circumstances, contrary to West’s contentions, the
State’s two questions did not open the door to West’s use of the diary to
impeach D.M. See, e.g., Credille v. State, 925 S.W.2d 112, 116 (Tex.
App.—Houston [14th Dist.] 1996, pet. ref’d). We overrule issues four, five, and
six.
IV. Mom’s Testimony
        A.     As an Outcry Witness
        In his eleventh issue, West maintains that the testimony of D.M.’s mother,
Ruth Dodson, constituted inadmissible hearsay. He claims that the trial court
abused its discretion by admitting Dodson’s testimony concerning D.M.’s outcry
because the State designated D.M.’s father as the outcry witness. See Tex.
Code Crim. Proc. Ann. art. 38.072 (Vernon Supp. 2003).
        Article 38.072 allows the first person to whom the child described the
offense in some discernible manner to testify about the statements the child
made. Id.; Garcia v. State, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990).
Because of the way in which the statute is written, an outcry witness is not
person-specific, but event-specific. Broderick v. State, 35 S.W.3d 67, 73 (Tex.
App.—Texarkana 2000, pet. ref’d). Before more than one outcry witness may
testify, however, the outcry must be about different events and not simply a
repetition of the same event as related by the victim to different individuals. Id. 
But there may be only one outcry witness to the victim's statement about a
single event, and the proper outcry witness to a single event is the first adult
person other than the defendant to whom the victim made a statement
describing the incident. Id.; see also Thomas v. State, 1 S.W.3d 138, 142 (Tex.
App.—Texarkana 1999, pet. ref’d) (holding proper outcry witness is not to be
determined by comparing the statements the child gave to different individuals
and then deciding which person received the most detailed statement about the
offense).Here, in accordance with article 38.072, the State designated the child’s
natural father as its outcry witness. Tex. Code Crim. Proc. Ann. art. 38.072.
After the State made its outcry designation, it nonetheless called Dodson,
D.M.’s mother, to testify about D.M.’s statements to her regarding the same
event. Because the State designated D.M.’s father as the outcry witness, 
Dodson’s testimony regarding D.M.’s statements to her about this same assault
constituted inadmissible hearsay. See Thomas, 1 S.W.3d at 142. Thus, the
trial court abused its discretion by admitting Dodson’s hearsay testimony over
West’s objection. See Josey v. State, 97 S.W.3d 687, 698 (Tex.
App.—Texarkana 2003, no pet.) (holding trial court erred by permitting
testimony of third outcry witness as to same event over defendant’s hearsay
objection); Broderick, 35 S.W.3d at 73-74 (holding trial court erred by permitting
testimony of second outcry witness as to same event over defendant’s hearsay
objection).
        Having determined that the trial court erred by admitting Dodson’s
testimony over West’s hearsay objection, we now apply a rule 44.2(b) harm
analysis. Tex. R. App. P. 44.2; see Josey, 97 S.W.3d at 698; Broderick, 35
S.W.3d at 73-74. The reviewing court must deem the error harmless if, after
reviewing the entire record, the court is reasonably assured the error did not
influence the jury's verdict or had but a slight effect. Josey, 97 S.W.3d at 698. 
If the same or similar evidence is admitted without objection at another point
during the trial, the improper admission of the evidence will not constitute
reversible error. Id.
        Dodson’s hearsay outcry testimony was that, in response to her
questioning of D.M., D.M. stated that her stepfather had put his hands on her,
that he had put his mouth on her, that she did not have her clothes on, and that
West was not clothed. D.M. herself, however, gave detailed testimony
concerning the assault. She testified that during the assault West “pointed out
my different parts, my vagina and my clitoris”; “spread the skin . . . back and
showed me”; touched her “breasts and nipples” “and had me touch them, also”;
“asked me if I wanted to see what a penis looked like and that’s when he took
his clothes off to show me”; “showed me the head and explained that to me”;
asked her to touch his penis, “so I can see what it’s like when a man became
aroused”; “said I would have to put my mouth on it in order for him to be able
to ejaculate”; asked her to put her mouth on his penis; said, “So you don’t ever
want to know what it’s like for a guy to put his mouth on you, I’m going to
show you”; “put his mouth on my genitals” and she felt his tongue going inside;
and said, “I’m going to show you what it’s like for a guy’s penis to go in you,
and he tried to put his penis in me.”
        Here, Dodson’s hearsay testimony was not harmful in light of D.M.’s
detailed, factually specific testimony concerning the assault. We are reasonably
assured that the error in admitting Dodson’s hearsay outcry testimony did not
influence the jury's verdict or had but a slight effect. See Tex. R. App. P.
44.2(b); see also Anderson v. State, 717 S.W.2d 622, 627 (Tex. Crim. App.
1986). We overrule West’s eleventh issue.
        B.     As to the Social Workers’ Recommendation
        In his twelfth issue, West maintains that the trial court erred by admitting 
Dodson’s testimony that a social worker recommended Dodson talk to D.M.
about the assault incident.


 West contends that this testimony also was
inadmissible hearsay. The State, on the other hand, argues that the social
worker’s recommendation was not offered to prove the truth of the matter
asserted—that Dodson should talk to D.M.—but instead simply to “give some
context” to what Dodson did next, i.e., talk to D.M.
        Out-of-court statements admitted for the purpose of explaining how a
defendant became a suspect and not for the truth of the matter asserted do not
constitute inadmissible hearsay. Dinkins v. State, 894 S.W.2d 330, 347 (Tex.
Crim. App.), cert. denied, 516 U.S. 832 (1995); Cano v. State, 3 S.W.3d 99,
110 (Tex. App.—Corpus Christi 1999, pet. ref’d). Likewise, out-of-court
statements may be admitted as circumstantial evidence from which an inference
may be drawn, and not for the truth of the matter stated therein, without
violating the hearsay rule. Gholson v. State, 542 S.W.2d 395, 398 (Tex. Crim.
App. 1976), cert. denied, 432 U.S. 911 (1977).
        The mother’s testimony here was not offered to prove the truth of the
matter asserted but to show contextually what happened next. In other words,
the testimony was admitted to show what happened next in the chain of events
once D.M. had been interviewed on videotape. If the statement was offered to
prove the truth of the matter asserted, i.e, the social workers’ opined that for
therapy required D.M.’s mother to talk to her, then it would be hearsay. See
Levario v. State, 964 S.W.2d 290, 296 (Tex. App.—El Paso 1997, no pet.). We
hold that Dodson’s testimony was not hearsay and that, therefore, the trial court
did not err by admitting it over West’s hearsay objection.
        Relying on Miller-El v. State, West also claims that the direction of the
State’s questioning of Dodson was “patently driven” towards eliciting forbidden
victim impact evidence. 782 S.W.2d 892, 895 (Tex. Crim. App. 1990). The
facts in Miller-El, however, are distinguishable from the present facts. In Miller-El, the victim was shot, severing his spinal cord and paralyzing him. Id. at 894.
The court of criminal appeals recognized that the defendant’s treating doctor’s
testimony that the victim would have special needs for the rest of his life, that
as a result of the paralysis he would never regain bladder and bowel control or
sexual and procreative functions, that he would be required to maintain a
constant vigilance to prevent infection and bed sores, and that recurring
spasticity could ultimately deprive him even of the use of a wheelchair,
constituted victim impact testimony and was inadmissible at the guilt innocence
phase of the trial. Id. at 894-95. By contrast, here, Dodson’s testimony that,
after D.M. was interviewed, social workers told Dodson to talk to D.M. is not
the sort of testimony designed to “inflame the minds of the jury” as was the
testimony in Miller-El. Id. at 893. The State’s questioning was either not
intended to elicit victim impact testimony or was curtailed by West’s objection
before any victim impact testimony was elicited. We overrule West’s twelfth
issue. V. West’s Motion for Mistrial
        In issue thirteen, West argues that the trial court erred by denying his
motion for mistrial after the State prefaced a question to Dodson with the
statement, “Now, this is really important, Ms. Dodson.” Following this
comment, West objected. The trial court sustained West’s objection and
instructed the jury to disregard the prosecutor’s comment. West moved for a
mistrial, and the trial court denied his motion. Following this exchange, the
State asked Dodson whether she had coached D.M. in her accusations against
West. Dodson answered that she had not.
        A. Standard of Review
        Mistrials are an extreme remedy for prejudicial events occurring during the
trial process. Bauder v. State, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996);
Jackson v. State, 50 S.W.3d 579, 588 (Tex. App.—Fort Worth 2001, pet.
ref’d). The declaration of a mistrial ought to be an exceedingly uncommon
remedy for residual prejudice remaining after objections are sustained and
curative instructions given. Bauder, 921 S.W.2d at 698. For this reason,
judicial admonishments to the jury are presumed effective. Id. (citing Waldo v.
State, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988)).
        When the trial court sustains an objection and instructs the jury to
disregard but denies a defendant's motion for a mistrial, the issue is whether the
trial court erred in denying the mistrial. Goodwin v. State, 91 S.W.3d 912, 916
(Tex. App.—Fort Worth 2002, no pet.). Its resolution depends on whether the
court's instruction to disregard cured any prejudicial effect. Id. Only when it is
apparent that an objectionable event at trial is so emotionally inflammatory that
curative instructions are not likely to prevent the jury being unfairly prejudiced
against the defendant is a trial court required to grant a mistrial. Bauder, 921
S.W.2d at 698. We review the trial court’s denial of a mistrial deferentially
under an abuse of discretion standard. Trevino v. State, 991 S.W.2d 849, 851
(Tex. Crim. App. 1999); Jackson, 50 S.W.3d at 588. 
        B.     Instruction Presumed Effective
        Immediately after sustaining West’s objection to the prosecutor’s prefatory
comment, “Now, this is really important, Ms. Dodson,” the trial court instructed
the jury to “not consider the last remark for any purpose.” We must presume
that this instruction was effective. See Bauder, 921 S.W.2d at 698. The
comment made by the State here simply was not an objectionable event that
was so emotionally inflammatory that it undermined the efficacy of the trial
court's instruction to disregard. See id. (citing Kemp v. State, 846 S.W.2d
289, 308 (Tex. Crim. App. 1992), cert. denied, 508 U.S. 918 (1993)); see also
Jones v. State, 100 S.W.3d 1, 5 (Tex. App.—Tyler 2002, pet. ref’d) (holding
trial court did not abuse discretion by denying mistrial when State elicited
testimony regarding defense witness's two stale misdemeanor theft
convictions). Consequently, the trial court did not abuse its discretion by
denying West’s motion for a mistrial. We overrule West’s thirteenth issue.
VI. The Allen Charge
        In his fourteenth and fifteenth issues, West argues that the trial court
erred by overruling his objection to the Allen charge and that, although he did
not object, the Allen charge’s “partial definition” of reasonable doubt caused him
egregious harm, entitling him to reversal under Almanza. Almanza v. State, 686
S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh’g).
        A.     Standard of Review
        An Allen charge is usually given in response to a specific request from the
jury during situations in which the jury is deadlocked. Jackson v. State, 753
S.W.2d 706, 712 (Tex. App.—San Antonio 1988, pet. ref'd). An Allen charge
jury instruction will constitute reversible error only if, on its face, it is so
improper as to render jury misconduct likely or jury misconduct is demonstrated
to have occurred in fact. Calicult v. State, 503 S.W.2d 574, 576 n.2 (Tex.
Crim. App. 1974). To prevail on a complaint that an Allen charge is coercive,
an accused must show that jury coercion or misconduct likely occurred or
occurred in fact. Love v. State, 909 S.W.2d 930, 936 (Tex. App.—El Paso
1995, pet. ref’d); Jackson, 753 S.W.2d at 712; Davis v. State, 709 S.W.2d
288, 291 (Tex. App.—Corpus Christi 1986, pet. ref'd), cert. denied, 481 U.S.
1057 (1987). An Allen charge is unduly coercive and therefore improper only
if it pressures jurors into reaching a particular verdict or improperly conveys the 
court’s opinion of the case. Arrevalo v. State, 489 S.W.2d 569, 571 (Tex.
Crim. App. 1973)).
        B.     Allen Charge Not Coercive
        Following a five-day trial, the jury retired to deliberate at about 4:40 p.m.
on the last day of trial. After deliberating some time, the jury sent out a note
indicating that it was deadlocked. Eventually, at approximately 5:55 p.m., the
jury retired for the evening without reaching a verdict. Deliberations
recommenced the following morning. At approximately 1:53 p.m., the jury sent
out another note stating that it was unable to reach a verdict.


 The trial court
met with the attorneys, and all agreed that the trial court would inquire as to the
numerical split of the jury.


 At approximately 2:00 p.m. the jury sent out a note
indicating that the split was 11 to 1. The trial court then decided to give the
supplemental jury instruction known as an Allen charge. West’s counsel
objected, pointing out that the jury “has had 24 hours to think about this,”
“[t]hey have slept overnight on it,” and “ha[ve] expressed their opinion that they
[could not] reach a verdict at least one time.” West’s counsel also asserted that
because the court knew that there was one hold-out juror, the Allen charge was
unduly coercive on that juror. The trial court overruled West’s objections and,
at 2:07 p.m., instructed the jury as follows:
Members of the jury, you are instructed that in a large proportion of
cases absolute certainty cannot be expected. Although the verdict
must be the verdict of each individual juror and not a mere
acquiescence in the conclusion of other jurors, each juror should
show a proper regard for the opinions of the other jurors. 
 
You should listen, with a disposition to being convinced, to
the arguments of the other jurors. If a large number of jurors are for
deciding the case in one way, those in the minority should consider
whether they are basing their opinion on speculation or guesswork
and not on the evidence in the case. 
 
                . . . .
 
If this jury find [sic] itself unable to arrive at a unanimous
verdict, it will be necessary for the Court to declare a mistrial and
discharge the jury. The indictment will still be pending, and it is
reasonable to assume that the case will be tried again before
another jury at some future time. Any such future jury will be
empaneled in the same way this jury has been empaneled and will
likely hear the same evidence which has been presented to this jury. 

The questions to be determined by that jury will be the same
questions confronting you, and there is no reason to hope that the
next jury will find these questions any easier to decide than you
have found them. 
 
With this additional instruction, you are instructed to continue
deliberations in an effort to arrive at a verdict that’s acceptable to
all members of the jury if you can do so without doing violence to
your conscience. 
 
The jury subsequently returned a unanimous verdict. 
 
        The instructions contained in the Allen charge utilized here are consistent
with similar instructions used in Allen charges used throughout this state and
have been held to be noncoercive. See, e.g., Howard v. State, 941 S.W.2d
102, 123 (Tex. Crim. App. 1996); Arrevalo, 489 S.W.2d at 571-72; Willis v.
State, 761 S.W.2d 434, 437-38 (Tex. App.—Houston [14th Dist.] 1988, pet.
ref'd); Rodela v. State, 666 S.W.2d 652, 652-53 (Tex. App.—Corpus Christi
1984, pet. ref'd); Ray v. State, 649 S.W.2d 142, 146-47 (Tex. App.—Fort
Worth 1983, pet. ref'd), superseded by rule on other grounds, Bee v. State, 974
S.W.2d 184, 188-89 (Tex. App.—San Antonio 1998, no pet.); M.J. McCormick
et al., Texas Practice: Criminal Practice and Forms Manual § 96.31 (10th ed.
1995). Likewise, the Fifth Circuit has consistently upheld the use of similar, if
not identical, Allen charge jury instructions. See, e.g., United States v. Kelly,
783 F.2d 575, 576-77 (5th Cir.), cert. denied, 479 U.S. 889 (1986); United
States v. Anderton, 679 F.2d 1199, 1203 n.3 (5th Cir. 1982); United States v.
Bottom, 638 F.2d 781, 786 (5th Cir. 1981).
        The Allen charge here does not contain the type of language courts have
held to be problematic and coercive. See, e.g., Green v. United States, 309
F.2d 852, 855 (5th Cir. 1962) (holding Allen charge was coercive that told jury
that it is the duty of the minority to listen to the argument of the majority with
some distrust of their own judgment because the rule is that the majority will
have better judgment than the mere minority). West does not point to any
specific language that he contends was coercive, and after reviewing the
instruction, we see no language that shows jury coercion likely occurred.
Specifically, the Allen charge given here does not tell the jury that one side or
the other possesses the superior judgment, nor does it tell them to distrust their
judgment. Additionally, the trial court carefully concluded the Allen charge by
instructing the jury that, in any event, it should try to arrive at a verdict
acceptable to all jurors only if it could do so “without doing violence to your
conscience.” We hold that the trial court did not err by overruling West’s
unduly-coercive objection to the Allen charge. We overrule issue fourteen.
        C.     No Partial Definition of Reasonable Doubt
 
        In his fifteenth issue, West claims that the Allen charge contained a partial
definition of reasonable doubt, thereby violating Paulson v. State, 28 S.W.3d
570, 573 (Tex. Crim. App. 2000). Specifically, West complains that the first
sentence of the Allen charge is a partial definition of reasonable doubt:
“Members of the jury, you are instructed that in a large proportion of cases
absolute certainty cannot be expected.” West did not object to the Allen charge
on this basis. Instead, he claims that Almanza applies and that despite the lack
of an objection he is entitled to reversal if he suffered egregious harm from the
allegedly erroneous partial definition. The State, however, contends that
Almanza does not apply to Allen charges at all.
        We do not need to reach the issue of whether Almanza applies to Allen
charges because, in any event, neither of the harm standards set out in article
36.19 and construed in Almanza applies unless an appellate court first finds
“error” in the jury charge. Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon
1981); Almanza, 686 S.W.2d at 174; Posey v. State, 966 S.W.2d 57, 60 (Tex.
Crim. App. 1998). When we evaluate a jury charge for a
reasonable-doubt-definition error, we first determine whether a definition of
reasonable doubt exists in the jury charge. Paulson, 28 S.W.3d at 573; Minor
v. State, 91 S.W.3d 824, 828 (Tex. App.—Fort Worth 2002, pet. ref’d) (citing
Carriere v. State, 84 S.W.3d 753, 759 (Tex. App.—Houston [1st Dist.] 2002,
pet. ref’d)). If not, the charge does not violate Paulson. Minor, 91 S.W.3d at
828.
        Here, the trial court simply instructed the jury that “in a large proportion
of cases absolute certainty cannot be expected.” In Geesa v. State, 820
S.W.2d 154, 162 (Tex. Crim. App. 1991), the required jury instruction
attempted to define reasonable doubt three times: (1)“A ‘reasonable doubt’ is
a doubt based on reason and common sense after a careful and impartial
consideration of all the evidence in the case”; (2) “It is the kind of doubt that
would make a reasonable person hesitate to act in the most important of his
own affairs”; and (3) “Proof beyond a reasonable doubt, therefore, must be
proof of such a convincing character that you would be willing to rely and act
upon it without hesitation in the most important of your own affairs.” However,
Paulson specifically overruled this portion of Geesa that required trial courts to
instruct juries on the definition of “beyond a reasonable doubt.” Paulson, 28
S.W.3d at 573. The instruction in the present case did not include any of the
overruled instructions and thus did not define the concept of reasonable doubt
at all. Consequently, the trial court did not violate Paulson by submitting the
instruction. See Minor, 91 S.W.3d at 828. We hold that the trial court did not
err by including the instruction that “in a large proportion of cases absolute
certainty cannot be expected” in its Allen charge. Accordingly, we overrule
West’s fifteenth issue.
VII. Sufficiency of the Evidence
        In his sixteenth and seventeenth issues, West challenges the factual and
legal sufficiency of the evidence to support his convictions. West raises five
grounds for his contention that the evidence is legally and factually insufficient:
(1) the lack of “physical evidence or corroboration” of D.M.’s testimony; (2) the
lack of evidence that D.M. suffers from any of the “symptoms” of a child sex
abuse victim; (3) the evidence that D.M. was motivated to fabricate allegations
against him because of the “nasty and bitterly contested divorce and child
custody fight” between Dodson and West concerning their two children; (4) the
evidence of an “inordinate” amount of time between the alleged assault and
D.M.’s allegations; and (5) the lack of evidence indicating in any way that West
“fits the profile of a person who would commit this offense.” 
        A.     Legal Sufficiency Standard of Review
        In reviewing the legal sufficiency of the evidence to support a conviction,
we review all the evidence in the light most favorable to the verdict in order to
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 319, 99 S. Ct. 2781, 2789 (1979); Burden v. State, 55 S.W.3d 608, 612
(Tex. Crim. App. 2001). This standard gives full play to the responsibility of the
trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to
draw reasonable inferences from basic facts to ultimate facts. Jackson, 443
U.S. at 319, 99 S. Ct. at 2789. When performing a legal sufficiency review, we
may not sit as a thirteenth juror, reevaluating the weight and credibility of the
evidence and, thus, substituting our judgment for that of the fact finder.
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1131 (2000).
        B.     Application of Legal Sufficiency Standard to Facts
        As previously outlined, D.M. provided a detailed account of the assault to
the jury. This testimony alone is legally sufficient to support West’s conviction.
See, e.g., Empty v. State, 972 S.W.2d 194, 196 (Tex. App.—Dallas 1998, pet.
ref’d) (noting testimony of child victim alone is sufficient to support conviction
for sexual assault); Ruiz v. State, 891 S.W.2d 302, 304 (Tex. App.—San
Antonio 1994, pet. ref'd) (same); Karnes v. State, 873 S.W.2d 92, 96 (Tex.
App.—Dallas 1994, no pet.) (same). We overrule West’s seventeenth issue. 
        C.     Factual Sufficiency Standard of Review
        In reviewing the factual sufficiency of the evidence to support a
conviction, we are to view all the evidence in a neutral light, favoring neither
party. Johnson v. State, 23 S.W.3d 1,7 (Tex. Crim. App. 2000); Clewis v.
State, 922 S.W.2d 126, 129, 134 (Tex. Crim. App. 1996). Evidence is
factually insufficient if it is so weak as to be clearly wrong and manifestly unjust
or the adverse finding is against the great weight and preponderance of the
available evidence. Johnson, 23 S.W.3d at 11. Therefore, we must determine
whether a neutral review of all the evidence, both for and against the finding,
demonstrates that the proof of guilt is so obviously weak as to undermine
confidence in the verdict, or the proof of guilt, although adequate if taken alone,
is greatly outweighed by contrary proof. Id. In performing this review, we are
to give due deference to the fact finder’s determinations. Id. at 8-9; Clewis,
922 S.W.2d at 136. We may not substitute our judgment for that of the fact
finder’s. Johnson, 23 S.W.3d at 12. Consequently, we may find the evidence
factually insufficient only where necessary to prevent manifest justice. 
Johnson, 23 S.W.3d at 9, 12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).
        To make a determination of factual insufficiency, a complete and detailed
examination of all the relevant evidence is required. Johnson, 23 S.W.3d 12.
A proper factual sufficiency review must include a discussion of the most
important and relevant evidence that supports the appellant’s complaint on
appeal. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
        D.     Application of Factual Sufficiency Standard to Facts
        The State’s first witness was D.M.’s father. He testified that after he and
Dodson divorced, Dodson married West. In the summer of 2000, when D.M.
was visiting her father, they had a conversation about sexual abuse. D.M.’s
father later realized that D.M. had been talking about an incident that had
occurred to her, but she asked him not to tell anyone and said that she would
tell her mother when she got home.
        Dodson testified that her father passed away on January 15, 1999, and
after the funeral she remained in Missouri while D.M. and the other children
returned home with West. Dodson testified that after she divorced West, one
day she was telling D.M. that she and D.M. needed to make an effort to get
along with West. D.M. said she did not want anything to do with West, and
when Dodson pressed her for an explanation, D.M. said West had “done some
things to her.” Dodson later pressed D.M. for more information, and D.M.
agreed to answer a few questions. Dodson learned that West had touched D.M.
and put his mouth on her and that neither of them had their clothes on.
Eventually, in January 2001, Dodson called Child Protective Services (“CPS”)
regarding the assault. Dodson took D.M. to a Children’s Advocacy Center and
to a counselor. 
        Through cross-examination of Dodson, the defense established that D.M.
does well in school and is outgoing. The defense also established that West
successfully brought a contempt action against Dodson in September 2001 for
failure to pay child support to him for their two children who resided with West.
After CPS investigated D.M.’s assault, the agency did not remove these two
other minor female children from his home.
        During D.M.’s testimony she identified West as her former stepfather and
as the person who assaulted her when she was eleven years old. D.M. said that
West showed her Playboy magazines several times prior to the assault and made
comments like “can you see why that would turn a guy on?” and “[w]ould you
ever do something like that?” One night, while Dodson was still in Missouri,
D.M. was in West and Dodson’s bedroom ironing jeans to wear to school the
next day. West started asking her what she knew about sex, and after they
talked for a little bit, he asked her if she had ever ironed her underwear.
Eventually, West told D.M. to iron her panties, and she bent over to take them
off from under her nightshirt. West instructed her to take off her nightshirt too,
so she did. After D.M. put on her ironed panties, West told her, “I’m going to
teach you about sex because your mother will never do so. That’s not her
thing. She doesn’t like to talk about it or anything. So I have to be the one to
teach you.” West then told D.M. to take off her panties, and as D.M. sat on the
side of the bed, West held a little mirror, touching D.M.’s private parts and
telling her, this is your vagina, “this is your clitoris.” West touched D.M.’s
breasts and nipples and had her touch them also. West then took off his clothes
and “showed” D.M. his penis. West told D.M. to touch his penis so she could
see what it was like when a man becomes aroused. West told her that if she
wanted to see what an ejaculation was, she would have to move her hand up
and down. West then told her she would have to put her mouth on his penis so
he could ejaculate, but D.M. refused. West told D.M. to lay down on the bed
and spread her legs so he could “show [her] something else.” He told her
because “you don’t ever want to know what it’s like for a guy to put his mouth
on you, I’m going to show you what that’s like.” D.M. said West put his mouth
on her vagina and clitoris and said she could feel it going inside of her. D.M.
testified, “After he did that for a while, he’s like, ‘Okay, I’m going to show you
what it’s like for a guy’s penis to go in you,’ and he tried to put his penis in
me.” West put is penis inside her vagina “a little bit,” but D.M. told him it hurt
and eventually he stopped. West told D.M., “Okay, well, I hope you learned
something. Now you don’t need to go out and find out what it’s like. It’s
getting late. You should go to bed.” He also told her, “Don’t tell anybody what
happened. They won’t believe you and I’ll get in a lot of trouble and you don’t
want me to get in trouble, right? You love me?” D.M. testified that she did not
tell anyone about the assault because she trusted West and thought that it was
really a lesson and that she needed to know those things.
        D.M. testified that eventually she told her mother that West had “done
some things” to her, but she never told her mother the whole story. D.M. said
her mother kept questioning her and said she would tell a little bit more and a
little bit more. But D.M. said it was a very hard subject to talk about, and she
did not like talking about it.
        Several witnesses testified for the defense, including West and Dodson’s
daughter, T.W. T.W. was nine years old at the time of trial and testified that
D.M. never told her that West had touched D.M.’s private parts. Kelly McGee
testified that she lives in Missouri and has known West for about twenty-five
years. She testified that West has never exhibited poor impulse control, a need
for immediate gratification, drug or alcohol abuse, anger problems, or low self-esteem. She testified that West’s reputation for being a peaceful and law-
abiding citizen in the community was good. Joe McGee, Kelly McGee’s
husband, testified that he went to high school with West and that West’s
reputation in the community for being a peaceful and law-abiding citizen was
good. He agreed with his wife’s testimony that West never exhibited the
characteristics outlined above. George Sorrell, West’s new father-in-law,
testified that he has known West for approximately two years. The defense
asked Sorrell about the same character traits, and he denied ever seeing West
exhibit any of the traits. Judy Sorrell Niemeier testified that she has known
West since West was in high school. When West was in high school, he dated
Niemeier’s daughter. She likewise testified that West has never exhibited the
list of character traits set forth above.
        West’s wife, Dana Suzanne West, also testified. She said that in April
2000 she saw West give a thirteenth birthday gift to D.M. She said D.M.
hugged West and acted glad to see him. Dana explained that she lives with
West and she has never observed any pornography in the house. West has
never expressed any unusual interest in sexual activity, is not manipulative, is
not easily angered or frustrated, had not demonstrated an immediate need for
gratification, and is not fascinated with sex or sexual things. Charles Winston,
a friend of West’s for twenty years, and Paul Watkins, a friend of West’s for
eight years, also testified that they never observed West exhibit any deviant
character traits. Carol Winston provided the same type of testimony.
        Bradley Craig testified that he is a social worker and that he conducted
about 900 social study investigations. He testified that standard “red flags” for
child sexual abuse are withdrawal, excessive daydreaming, poor relationships
with peer groups, poor self-esteem, a deterioration in academic performance,
sexual promiscuity, drug use, and decreased school attendance.
        During West’s testimony, he denied any sexual contact with D.M. and
specifically denied that he committed any of the acts alleged in the indictment.
West explained that while he was married to Dodson, she had an affair that led
to the couple’s divorce. The evening that West found out about the affair, he
asked both Dodson and D.M. to leave the house. He went to D.M.’s room and
told her to pack a bag and that she would have to leave because her mother
was having an affair. West said D.M. was very upset and crying. In the
divorce, West obtained custody of the couples’ two minor girls. Despite D.M.’s
accusations, CPS has not removed these two girls from West’s custody.
        Having carefully examined the evidence in a neutral light, including the
evidence relevant and supportive of West’s sufficiency of the evidence
arguments on appeal, we hold that the proof of West’s guilt is not so weak as
to undermine confidence in the jury’s verdict. Further, we hold that the
evidence of West’s guilt is not outweighed by contrary proof and that West’s
convictions for aggravated sexual assault are supported by factually sufficient
evidence. We overrule West’s sixteenth issue.VIII. Due Process Claims
        In his tenth issue, West argues that the trial court erred by refusing to
allow West to testify concerning allegedly untrue statements he found in D.M.’s
diary. He claims that his right to present his own testimony is a fundamental
tenant of due process and argues that the trial court’s refusal to let him offer
this testimony violated his due process rights under the Texas and United States
Constitutions.
        To preserve a complaint for our review, a party must have presented to
the trial court a timely request, objection, or motion that states the specific
grounds for the desired ruling if they are not apparent from the context of the
request, objection, or motion. Tex. R. App. P. 33.1(a)(1); Mosley v. State, 983
S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), cert. denied, 526 U.S.
1070 (1999). Further, the trial court must have ruled on the request, objection,
or motion, either expressly or implicitly, or the complaining party must have
objected to the trial court’s refusal to rule. Tex. R. App. P. 33.1(a)(2).
Preservation of error is a systemic requirement that this court should review on
its own motion. Martinez v. State, 878 S.W.3d 504, 507 n.7 (Tex. Crim. App.
2000); Hughes v. State, 22 S.W.2d 142, 151 (Tex. Crim. App. 1993) (op. on
reh’g), cert. denied, 511 U.S. 1152 (1994).
        Here, West did not assert during trial that the trial court’s refusal to let him
testify regarding the statement in D.M.’s diary about having “said” untrue things
violated his due process rights. Consequently, this alleged error is not preserved
for our review. We overrule issue ten.
IX. Conclusion
        Having overruled each of West’s issues, we affirm the trial court’s
judgment.
 
                                                          SUE WALKER
                                                          JUSTICE
 
PANEL B:   DAY, LIVINGSTON, and WALKER, JJ.
 
PUBLISH
 
DELIVERED: October 2, 2003